CASE No. 1047.

SCAIFE v. THOMSON.

1. The doctrine of implied revocation arising from an alteration of the estate of the testator considered.
2. Revocations by reason of actual alteration of estate resulted from the principle that a will of realty was in the nature of a conveyance and could pass only the lands owned at the time of its execution; but this principle does not require such revocation where the testator died after the act of 1858 (12 *Stat.* 700,) which directed that after-acquired lands might pass as personal estate does.
3. A testator, seized under his father's will of a one-eighth undivided interest in certain lands and also in a mill-tract, made his will in 1845, whereby, in the ninth clause, he devised to his sister M. " my interest or legatee's part " in the certain lands, " or my part " of the mill-tract, and " $100 in property or money just as may suit my executor best ; " and he declared that this property was to be M'.s " during her natural life and no longer, and at her death to be and belong to my executor and sons, this being all I desire she shall ever have of my estate." The tenth clause read: " I give, will and devise to H. and his children all the balance of my lands and all of my negroes and all the rest and residue of my estate of all kinds whatsoever, both personal and real, which I now have, or which I may hereafter own, or which I may own at the time of my death." And H. was nominated sole executor. In 1852, under proceedings in partition to which testator was a party, these lands and the mill-tract were sold at judicial sale and purchased by testator, who took deed from the officer of court. He died in 1868. *Held*, that the sale in 1852 did not imply an intention to revoke the devise contained in ninth clause, and that there had been no revocation of that devise.
4. Both M. and H. died before testator, and after his death the sons of H. elected that the mill-tract should pass to them under the ninth clause. *Held further*, that the sons of H. took between them only a one-eighth in-

Y

terest in the mill-tract, and that the remaining seven-eighths passed under the tenth clause to both sons and daughters of H.

5. The intent of a testator must be ascertained from the words of his will, and the circumstances by which he was surrounded at the time of its execution, and these circumstances may be proved by parol evidence. And the will must be construed as a whole.

6. Soon after testator's death, the four sons of H. took possession of the mill-tract, claiming it exclusively under the ninth clause of the will; proceedings were instituted the same year for the partition between the children of H. of all the lands of their father and of testator, except this mill-tract, which was in terms excluded from the prayer for partition; the eldest son sold his interest as one-fourth, to the second son, R., in 1868; the husband of one of the daughters rented this property from the sons for two or three years; the third son sold his interest as one-fourth to F., a stranger, in 1874; afterwards the fourth son died intestate, and his sisters and surviving brothers by their deed conveyed his interest, alleged to be one-fourth, to S., a stranger; R. then conveyed a one-twelfth interest each, to F. and S.; R., F. and S. erected valuable improvements. *Held*, that there being nothing in this case in the nature of a family arrangement, none of these acts, done while the daughters were silent but ignorant of their rights, estopped them from asserting their claim to a share in the mill-tract, except to the one-fourth which they had sold to S.

7. R. being guardian of one of his sisters could assert no adverse claim to this mill-tract as against her, until this relationship terminated; and there could be no adverse claim against any of the co-tenants unless the claim was adverse to all.

8. The Court of Equity has the right to decree rents and profits in partition, independently of the statute of 4 and 5 *Anne*, c. 16, § 27, (2 *Stat.* 438,) nor does the repeal of this statute, which authorized a particular form of action, prevent an action under the forms of the code of procedure, for enforcing a claim for rent. But all parties here having acted under a common mistake, the accounting was restricted to the commencement of the action.

9. Improvements having been put upon this property by R., F. and S. under the honest conviction of exclusive ownership, they are not liable for such rents and profits as are due to the improvements; and in making the partition, the portion improved should be assigned to R., F. and S. without any estimate of the value of the improvements, or, if sold, they should be allowed out of the proceeds of sale, in addition to their shares, the enhancement in price caused by the improvements.

Before WALLACE, J., Union, April, 1880.

Action by M. F. Scaife, M. E. Nowell and E. E. Mills against J. S. R. Thomson, Wade Fowler, J. C. Spears, and H. H.

Thomson, administrator with the will annexed of J. Waddy Thomson, deceased, begun September 1st, 1879. To the full statement contained in the opinion it will be proper to add only the Circuit decree, which was as follows :

I regret that for want of time I will not be able to give the reasons fully that have governed my conclusions in this case. I desire to say at the outset that I am entirely satisfied from the evidence that throughout the entire transactions involved in this proceeding, there has been no intentional wrong-doing. That the parties have acted throughout upon an honest, though perhaps an erroneous conviction of their legal right. That there has been no intentional misrepresentation, concealment, imposition, or abuse of confidence.

The leading questions in the case arise upon the construction of the ninth and tenth clauses of the will of J. Waddy Thomson. The will was executed in 1845. At that time the testator was entitled under his father's will to one-eighth of the mill-tract.

In disposing of a large estate by his will, and in the ninth clause thereof, he devises to his sister, M. Caroline Thomson, for life, with remainder to his brother, H. H. Thomson, and *his sons,* in fee, his part of the mill-tract, and $100, with the right to take another piece of property in lieu of the mill-tract, if his sister should so elect, and then proceeds to say that this was all of his estate he desired his sister to have. The tenth clause of the will gives and devises all of his property that he might afterwards acquire and hold at his death, and that had not been disposed of in the preceding clauses of his will, to his brother, H. H. Thomson, and his *children.* After the execution of his will, testator acquired the whole of the mill-tract upon a sale for partition among the legatees of his father's will. I am of the opinion that the sale in partition and purchase by the testator of the entire property known as the Mill-Tract, did not operate to revoke the ninth clause of the will. I have not time to state the reasons and authority for this opinion. M. Caroline Thomson died before the testator, as did his brother, H. H. Thomson. Whatever interest, therefore, they took under the ninth clause of the will, devolved upon the sons of H. H. Thomson. The testator died in 1868. What do the sons take

under the ninth clause? They exercised the right of election given by the will to M. Caroline Thomson, and elected to take the interest conveyed by the will in the mill-tract. Now what interest in that tract did the will convey? Since the A. A. in 1858, the will speaks as if executed at the death of testator, and property acquired after the time at which the will was actually executed, passes under the will, if there are words in the will that cover it, and a contrary intention does not appear. In the first place the testator uses the words, " my part," which, of course, mean less than the whole, and at that time he had a vested interest in one-eighth of the whole. But if the words, " my part," could be construed to mean the whole at death of testator, do not the words added to the bequest of testator to his sister—" this being all I desire she shall have of my estate"—prevent such construction and limit the devise to one-eighth of the whole? I am of the opinion, therefore, that the sons took under the ninth clause one-eighth of the mill-tract, and that the remaining seven-eighths passed under the tenth clause to the children of H. H. Thomson. Upon the death of the testator, H. H. Thomson (the younger) administered upon testator's estate, with the will annexed, and took legal advice as to the rights of the legatees under the will. He was advised that the *sons* took under the will the whole of the mill-tract. There being other lands devised by the will to the children of H. H. Thomson, and some of these being minors, proceedings were filed in the Probate Court for the partition. In the petition for partition, it is set out that the mill-tract is devised to the *sons,* and no partition of that tract is asked for. This was in December, 1868. The partition was ordered and made of the other lands of testator, and no order made as to the mill-tract. There were four brothers and three sisters. Each brother supposed, and such was the legal advice, that he was entitled to one-fourth of the mill-tract. In December, 1868, H. H. Thomson sold and conveyed to J. S. R. Thomson, one-fourth, his supposed interest in the mill-tract. J. S. R. Thomson in his own right, and as guardian of his infant brothers, Lewis and Waddy Thomson, leased the mill-tract to H. F. Scaife, husband of Mrs. Mary Scaife, who is one of the children of H. H. Thomson, deceased, with the knowledge of all the children of H. H.

Thomson, deceased. At this time, Mrs. Nowell and Mrs. Mills, plaintiffs herein, were minors. J. S. R. Thomson was guardian of Mrs. Nowell, and Henry H. Thomson was guardian of Mrs. Mills. Mrs. Scaife was of full age. Mrs. Nowell attained her majority in February, 1870 ; Mrs. Mills attained her majority in April, 1872. Mrs. Scaife took possession of the mill-tract under the lease, and resided there several years. In the meantime W. Waddy Thomson sold and conveyed one-fourth of the mill-tract to Dr. Wade Fowler. Lewis, before arriving at full age, died, and his estate was partitioned among his brothers and sisters. His interest in the mill-tract, supposed to be one-fourth, was sold and conveyed by all the children to J. C. Spears. J. S. R. Thomson, supposing he held one-fourth under the will and one-fourth under the deed of his brother, H. H. Thomson, conveyed one-twelfth to Dr. Wade Fowler, and one-twelfth to J. C. Spears ; the object being that J. S. R. Thomson, J. C. Spears and Dr. Wade Fowler should each own one-third of the property. Upon this state of facts, J. S. R. Thomson pleads the statute of limitations as a bar to the recovery from him of that part conveyed to him by his brother, H. H. Thomson. I am of the opinion that the facts make out a case of adverse possession by J. S. R. Thomson, and that the same facts make out a case of *ouster* against his co-tenants, the plaintiffs in the case. But he could not acquire a title to the interest of his ward, Mrs. Nowell, in the fourth he bought from H. H. Thomson under the statute of limitations. The statute did not run against her on account of the fiduciary relation between her and J. S. R. Thomson. This, however, will not, as in cases of minorities, protect the other sisters, to whom he sustained no such relation. Mrs. Scaife was of full age, with the power to sue, when the possession began, and the statute is a bar to her claim as against the one-fourth under consideration unless prevented by the minority of Mrs. Mills. The adverse possession began in January, 1868. Mrs. Mills attained her majority in April, 1872. The full ten years had run out before the commencement of this action—for more than five years of which Mrs. Mills was not under disability that prevented her from suing. I am of the opinion, therefore, as to the one-fourth conveyed to J. S. R. Thomson by H. H. Thom-

son, the claims of Mrs. Scaife and Mrs. Mills are barred, and that Mrs. Nowell is not, and that J. S. R. Thomson must account to Mrs. Nowell for her interest in that fourth. As to the fourth held by J. S. R. Thomson under a supposed devise, he waives all benefit from the statute of limitations, and must therefore account to the other parties in interest in proportion to their interest as ascertained by the principles of this decree. All the children of H. H. Thomson, deceased, having conveyed one-fourth to J. C. Spears, he of course has a good title to that extent. He also purchased one-twelfth from J. S. R. Thomson. At the time of this conveyance J. S. R. Thomson held a devise of one-fourth of one-eighth and one-seventh of seven-eighths. He held at the same time his brother Henry's deed for what his brother had the right to convey, which was precisely the same interest that J. S. R. Thomson held under the will of J. W. Thomson. To this extent Spears is protected in the purchase of the one-twelfth from J. S. R. Thomson. Dr. Wade Fowler holds a conveyance of one-fourth from W. Waddy Thomson, and a conveyance of one-twelfth from J. S. R. Thomson. The statute of limitations at the time of the conveyance had not matured W. Waddy Thomson's right to convey, nor have the ten years run out since Fowler bought. He nor Spears pleads the statute. He, also, as Spears, bought one-twelfth from J. S. R. Thomson. His deed from Waddy Thomson only conveyed to him Waddy's share as one of the brothers, and for the balance he must account to the legatees under the will according to the principles of this decree. As to the one-twelfth conveyed to him by J. S. R. Thomson, he is protected as Spears is and according to the dates of his deed from J. S. R. Thomson, whether prior or subsequent to Spears, deed from J. S. R. Thomson.

I am of the opinion that the plaintiffs are entitled to an account of the rents and profits in proportion to their interests in the property, for a period beginning four years before the commencement of this action. It is true that under the common law a co-tenant had no right of action against his co-tenants for rents and profits. The English statute 4 and 5 *Anne, c.* 15, 16, gave this right of action. That statute, once of force in this state, was repealed in the revised statutes. But our Court of Equity, in

*Corbett* v. *Laurens,* 5 *Rich. Eq.* 326, says: " It seems to be just that while we afford relief to tenants in common *beyond* the operation of the statute of Anne," &c. The amount of the rents and profits, however, must be ascertained with reference to the state of the property at the time defendants went into possession. The defendants have expended large sums in improvements. The plaintiffs are not required to account for any part of this expense, and, of course, are not entitled to share in the increased profits therefrom before the partition of the property. *Thomson* v. *Bostick, McM. Eq.* 69; *Corbett* v. *Laurens,* 5 *Rich. Eq.* 314. I have not been able to see anything in the testimony that would operate to estop the plaintiffs.

It is ordered and decreed that a writ of partition be issued to divide the mill-tract among the parties according to the principles of this decree.

It is also ordered that it be referred to D. A. Townsend, Esq., to take an account of the rents and profits, according to the opinions herein expressed.

Thereupon the defendants, H. H. Thomson and J. S. R. Thomson, duly served and filed the following notice and grounds of appeal, to wit:

1. For that his Honor has held that under the tenth clause of the will of the testator, the interest of the testator in the mill-tract, acquired subsequently to the date of the will, passed to the *children* of H. H. Thomson, deceased. Whereas his Honor should have held that said mill-tract went, under the ninth clause of the will, to the *sons* of said H. H. Thomson.

2. For that his Honor has erred in not holding that the statute of limitations was a bar, so far as the same was pleaded, as well to the claim of the plaintiff, Mrs. Nowell, as of the other plaintiffs.

3. For that his Honor should have held that the defendant, J. S. R. Thomson, was protected by the bar of the statute of limitations as to one-fourth part of the mill-tract.

4. For that his Honor has decided that the defendants are not entitled in the partition and accounting to the value of improve-

ments put upon the property by them. Whereas his Honor should have held the reverse.

5. For that his Honor has erred in holding that the plaintiffs are entitled to any account for rents and profits of the mill-tract, whereas he should have held the contrary.

6. For that his Honor erred in holding that Mrs. Scaife and Mrs. Mills are entitled each to an undivided two-thirty-seconds part, and Mrs. Nowell to an undivided three-thirty-seconds part in said mill-tract.

7. For that his Honor should have dismissed the complaint as to each and all of the defendants.

8. Because his Honor did not hold that the defendants now in possession of the land, should be allowed credit in the partition for the improvements .made upon the property by them, or those under whom they claim, to the extent of the enhanced value of the property by reason of the improvements.

9. Because his Honor, by the decree, debarred said defendants and each of them in this or any other proceeding from obtaining any compensation whatever, for the improvements upon said lands put there by them, or those under whom they claim.

The defendants, Wade Fowler and J. C. Spears, duly served and filed the following notice and grounds of appeal, to wit:

1. For that his Honor, Judge Wallace, held that under the ninth clause of the will of Waddy Thomson, the sons of H. H. Thomson took only the one-eighth interest in the mill-tract of land which testator owned at the time he executed his will.

2. For that his Honor did not hold that the plaintiffs were estopped, as far as their claims against these defendants are concerned—

*First.* By the proceedings in partition in 1868; or, *second,* by their long acquiescence in the right claimed by their brothers to the whole of the mill-tract; or, *third,* by the implication of the deed to Joshua C. Spears, that the brothers owned the entire interest in the whole of the mill-tract; or, *fourth,* by all the transactions and circumstances taken together amounting to a family settlement or agreement.

3. For that his Honor did not hold that the defendants having

paid a full price for the land, expended much money in improvements thereon, relying upon the acquiescence, acts, and assumptions and acknowledgments of rights of the plaintiffs, that their brothers took the entire interest in the mill-tract under the will, whatever might be the plaintiffs' rights as to their brothers, these defendants could not be made to suffer from the mistake of the plaintiffs, or their over-confidence in their brothers.

4. For that his Honor held that the plaintiffs were entitled to an accounting for rents and profits in the land.

5. For that his Honor did not decree that the defendants should be allowed a rebate or set-off to. the extent of the value of the improvements or betterments made by them upon the land.

The plaintiffs also duly served and filed their notice of appeal and exceptions, alleging that his Honor erred :

1. In holding that the sale of the land in dispute in 1852 for partition between the heirs of Richard Thomson, deceased, did not operate as a revocation of the ninth clause of the will of Joseph W. Thomson, deceased.

2. In holding that the facts of the case make out a case of adverse possession by J. S. R. Thomson, and that the same facts make out a case of ouster against his co-tenants, the plaintiffs in this case.

3. In holding that the interests of the plaintiffs, Mary F. Scaife and Eugenia E. Mills, in the one-fourth of the said land purchased by J. S. R. Thomson from H. H. Thomson, was barred by the statute of limitations.

4. In holding that the plaintiffs were not entitled to an account of the rents and profits for a longer period than four years before the commencement of this action.

5. In holding that the rights of any of the plaintiffs are in any manner barred by the statute of limitations.

*Mr. E. H. Bobo*, for plaintiffs.

It is conceded that under the act of 1858, the after-acquired lands of testator pass under the will. Does the land in dispute pass under the ninth or tenth clause? The intention, as inter-

preted by the state of affairs at the date of the will, must govern. 14 *How.* 399 ; 2 *Strob. Eq.* 272 ; *Rich. Eq. Cas.* 294. And the will must be construed as a whole. 2 *S. C.* 517 ; 5 *Rich. Eq.* 322 ; 8 *Cranch* 66 ; 1 *Jarm. on Wills* (5th *Am. ed.*) 604, note 4, 605, 606. The ninth clause here is restrictive, and the tenth clause requires the after-acquired part to pass to the children. 10 *S. C.* 414 ; 2 *Strob. Eq.* 272 ; *Rich. Eq. Cas.* 294 ; 33 *N. Y.* 558 ; 1 *Redf. on Wills* 390.

The sale under the partition proceedings in 1852 operated as a revocation of the ninth clause. 4 *Kent* 528–531 ; 7 *Johns. Ch.* 258 ; 14 *How.* 396 ; 14 *Ves.* 584 ; 9 *Dana* 25 ; 5 *Ves.* 654 ; 1 *Roll. Abr.* 615 ; 3 *Lev.* 108.

H. H. Thomson was administrator *cum testamento annexo*, and also guardian of Mrs. Mills until 1872, and being thus trustee his conveyance of more than his real share operated as a fraud, and the statute of limitations does not bar this action. 1 *S. C.* 337 ; 6 *Wheat.* 498 ; 2 *Sch. & Lef.* 607 ; 2 *Desaus.* 53, 233 ; *Kerr on Fraud & M.* 150, 178, 183. J. S. R. Thomson cannot have the benefit of the statute, because he was guardian of Mrs. Nowell until within a period less than ten years before action brought. *Tyler on Eject.* 150 ; 3 *Murph.* 583 ; 2 *Hayw.* 129 ; 4 *Desaus.* 77 ; 2 *Desaus.* 55. An adverse possession by a tenant of an undivided part of the whole premises, cannot confer a title to any part thereof, so long as the co-tenant has a clear title and right of possession to an undivided part of the same. In this case the plaintiffs had a clear right to their share of the part now owned by Fowler, and also to the part sold by J. S. R. T. 14 *S. C.* 180 ; 2 *B. C.* 181 ; 1 *Washb. on Real Prop.* 417 ; 1 *Hill on Real Prop.* 804, 807. There can be no adverse possession of an undivided part. 6 *Rich.* 67 ; *Tyler on Eject. & Ad. Enj.* 907 ; 38 *Vt.* 344 ; 4 *Wheat.* 213 ; 6 *Johns.* 218 ; *Tyler on Eject. & Ad. Enj.* 900 ; 2 *Smith's Lead. Cas.* (5th *ed.*) 560. Particularly so here, on account of the relationship of the parties. Ignorance of rights will prevent the running of the statute until those rights are discovered. 7 *Yerg.* 222 ; 1 *Edw. Ch.* 343 ; 8 *Dana* 495 ; 6 *Dana* 180 ; *Kerr on Fraud & M.* 41–95 ; 1 *Story's Eq.* 217, 218. Mistake of law or fact, under the circumstances, will prevent the bar of the statute. 2 *Story's Eq.* 737, 739 ; 1 *Story's*

*Eq.* 117–148; 2 *Kent* 129–147. There is no estoppel. 18 *Wall.* 271; 1 *Story's Eq.* 391; 1 *Lead. Cas. Eq.* 117; 3 *Otto* 326; 3 *Watts* 240; 4 *Harris* 361. The plaintiffs did not know their rights, and so the elements of estoppel are wanting. *Big. on Estop.* 437, 467.

The plaintiffs are entitled to rents and profits. 5 *Rich. Eq.* 325. Nor can the defendants be allowed for their improvements. *McM. Eq.* 69, 75, 298; 5 *Rich. Eq.* 314.

*Mr. R. W. Shand*, on same side.

*Messrs. Duncan & Cleveland*, for defendants Thomson.

The partition sale in 1852 did not operate as a revocation of the ninth clause. 4 *Rich. Eq.* 304; *Freem. on Judg.*, § 304; 1 *Wms. on Ex'rs.* 204, note; 1 *Jarm. on Wills* (5th *Am. ed.*) *151 and note; 4 *Kent* *530. And the act of 1858 confines these revocations to cases where the property is alienated at the time of the death. J. S. R. Thomson holds, by adverse possession, the part purchased by him in 1868. The saving of the statute in favor of Mrs. Nowell should not protect the others. *Tyler on Eject. & Ad. Enj.* 933; 1 *Bail.* 192. But it does not apply as to personalty. 1 *Hill's Ch.* 375; 2 *Hill* 334. Nor as to rents and profits. 4 *Strob. Eq.* 170. In the cases cited there was actual minority at time of action brought. But the statute cannot avail Mrs. Nowell. 4 *Rich.* 619. She could have brought her action before her majority. 11 *S. C.* 581; *Ang. on Lim.*, §§ 42, 174, 178; *Rice* 41; 2 *Strob. Eq.* 337; 2 *Rich. Eq.* 259. The renunciation of a trust gives currency to the statute. 4 *Rich. Eq.* 60; 11 *S. C.* 294; 13 *S. C.* 20. Mrs. Nowell had only five years within which to bring her action. 4 *Rich.* 619; *Ang. on Lim.*, §§ 194, 197; 2 *Rich. Eq.* 120.

Defendants should not have been required to account for rents and profits. There was no proof that more than their share had been cultivated. *Freem. on Co-ten.*, § 271; 5 *Rich. Eq.* 318; *McM. Eq.* 77; 1 *Hill's Ch.* 49; 2 *Id.* 370. It is discretionary whether rents should be allowed before action brought. 2 *McC. Ch.* 320; 5 *Rich. Eq.* 268; 4 *Strob. Eq.* 169; 1 *Hill's Ch.* 381; *Lewin on Trusts* *751; *Perry on Trusts*, § 872. But

there was no remedy at common law for rents—the only remedy was given by statute 4 and 5 *Anne, ch. XVI.*, § 27, which being now repealed, (*Gen. Stat.* 778), there is no remedy left for rents. 25 *Minn.* 222; *Bac. Ab., tit. " Joint Tenants,"* L. 304; *Freem. on Coten.*, §§ 259, 270; 1 *Washb. on Real Prop.* *420; *McM. Eq.* 75, 481; 19 *Gratt.* 38; 18 *Am. R.* 169; 15 *Sim.* 303. Defendants should have been allowed compensation for inprovements. 3 *Desaus.* 245; *Chev. Eq.* 213; 1 *Strob. Eq.* 350; 3 *Rich. Eq.* 173; 1 *Rich. Eq.* 324; 4 *Rich. Eq.* 476; 1 *Bouv. Inst.*, § 185; 1 *Pars. on Cont.* 221; 2 *Story's Eq*, §§ 799 *a*, 1237, 1239; 1 *Story* 478; 8 *Wheat.* 77; 4 *Rich. Eq.* 476.

The sons of H. H. Thomson were exclusively entitled to the land in dispute, under the ninth clause of the will. Look at that clause alone. A will of real estate was in the nature of a conveyance, (2 *Bl. Com.* 378; 16 *How.* 275; 9 *Rich. Eq.* 133), but ambulatory, (1 *Jarm. on Wills* 26; 4 *Kent* 520); and the legal phrases will be construed as in a deed, (*O'Hara on Wills* 24; 1 *Greenl. on Ev.*, § 287); and words are taken strongly against testator. The ninth clause, written in 1868, would have carried the whole interest, for his part was then the whole. The act of 1858 put real property on the same footing as personal, and this ninth clause would have carried personalty. 5 *Rich.* 468; 1 *Ves., Sr.*, 141; 7 *Ves.*, 398; 2 *Strob. Eq.* 283. It follows that since 1858 this clause would carry the real estate there mentioned as owned at the death. Whether less or more, it was still his part. The testator knowing the act of 1858, did not republish his will. The whole will shows such intention, and it must be effectuated. 2 *Redf. on Wills* 486; 1 *Wms. on Ex'rs* 219; 1 *Roper on Leg.* *249. Nor is parol evidence permissible to show the interest owned at the date, for the purpose of affecting the intention. *Wigram on Wills* 29, 31, 53, 99; 8 *Mass.* 3; 5 *Pick.* 510; 47 *Barb.* 263; 1 *Rich. Eq.* 396. It was only the act of 1858 which permitted the after-acquired interest to pass. 9 *Rich. Eq.* 133. Like the codicil in 4 *Rich. Eq.* 260, the act of 1858 was as a republication of the will, which carried the part— the whole—then owned by testator. The following authorities sustain this view : Note to 14 *Rich. Eq.* 257; 1 *Jarm. on Wills* *327–335, and cases cited. Other tracts may have been

acquired, which would pass under the tenth clause. The quantity of interest intended cannot be affected by extrinsic evidence. *Wigram on Wills* 127, 170, 171 ; 2 *Black* 418 ; 1 *Jarm. on Wills (ed.* 1880) \*199. Even if admissible, the general must give way to the specific devise ; and now, a residuary devise of land is not specific. *O' Hara on Wills* 355 ; 1 *Cush.* 107 ; 14 *Rich. Eq.* 256 ; 2 *Wms. on Ex'rs* 1696 ; *Dud. Eq.* 161. Special attention is asked to *Garrison* v. *Garrison*, 29 *N. J.* 153, which is strikingly similar to our case.

*Mr. R. Munro,* on same side.

*Mr. J. H. Rion,* for defendants Fowler and Spears, in addition to other points discussed by other counsel, contended that the partition of 1868, the payment of rent by the husband of one of the daughters, the recitals in the assignment to Fowler and the deed to Spears, the erection of improvements, and the insolvency of Fowler's vendor, make it a case which equity will not permit to be disturbed ; and that all the circumstances of the case make virtually a family agreement that the sons should take the mill-tract exclusively. Such an agreement, equity will not permit to be disturbed. 1 *Ves & B.* 30 ; 1 *Keen* 683 ; 1 *Story's Eq.*, §§ 113, 137, 138.

July 2d, 1881. The opinion of the court was delivered by

McIVER, A. J.   J. Waddy Thomson departed this life July 5th, 1868, leaving a will bearing date September 30th, 1845. The questions raised by this appeal depend for their solution upon the proper construction of the ninth and tenth clauses of the will, which are in the following words :

" *Ninthly.* I give, will ànd devise to M. Caroline Thomson my interest or legatee's part of the Walker and Tuck bottoms, joining her lands, or my part of the mill-tract of land and mills in Union district on Thickety creek, and one hundred dollars worth in property or money, just as may suit my executor best. Now I give this property, land, &c., to my sister during her natural life and no longer, and at her death to be and belong to my ex-

ecutor and sons. This being all I desire she shall ever have of my estate.

" *Tenthly.* I give, will and devise to Henry Hopson Thomson and his children all the balance of my lands, and all of my negroes, and all the rest and residue of my estate of all kinds whatsoever, both personal and real, which I now have, or which I may hereafter own, or which I may own at the time of my death. It is my wish and desire that he shall keep all I have here willed him, and not sell it off, but he can give or divide it as he may think best. I also request him to take special care of my old, faithful, favorite negroes, and not separate them, hereafter named."

By the last clause Henry H. Thomson was appointed executor. The life tenant, M. C. Thomson, and the executor, Henry H. Thomson, both predeceased the testator. At the date of his will the testator owned an undivided one-eighth of the mill-tract —the land which is the subject matter of the present controversy —as one of the devisees under the will of his father ; but subsequently, to wit, in 1852, under proceedings for partition, the mill-tract was sold and J. Waddy Thomson became the purchaser, thus acquiring a right to the remaining seven-eighths of that tract. Henry H. Thomson, the executor, at the time of his death left four sons—H. H. Thomson, J. S. R. Thomson, W. W. Thomson and R. L. Thomson—and three daughters, the plaintiffs in this action. After the death of J. Waddy Thomson the four sons went into possession of the mill-tract under a claim that it passed to them, to the exclusion of their sisters, under the ninth clause of the will, and shortly afterwards J. S. R. Thomson bought the interest of H. H. Thomson in the mill-tract and took a deed from him, dated December 5th, 1868, for an undivided one-fourth of the same. About the same time proceedings were instituted for the partition of the real estate of J. Waddy Thomson, consisting of many tracts, amongst the plaintiffs and their brothers, but the mill-tract was not only not mentioned among the tracts subject to such partition, but it was declared in the bill for partition to be the property of the brothers, and was expressly excepted in the prayer for partition. To these proceedings the plaintiffs were made parties—Mrs. Nowell and Mrs. Mills being minors at that time, by guardian *ad litem,* and Mrs.

Scaife and her husband consenting in writing to the partition. On May 12th, 1874, R. L. Thomson, being a minor, died intestate, leaving as his heirs-at-law his brothers above named, and his sisters, the plaintiffs.

On September 22d, 1874, W. W. Thomson conveyed to the defendant Fowler an undivided one-fourth interest in the mill-tract, who soon afterwards entered into negotiations with the heirs of R. L. Thomson for the purchase of his interest, which resulted in his taking an assignment from the plaintiffs and H. H. Thomson of the amount " arising from the sale of the one-fourth interest in the mill-tract belonging to the estate of R. Lewis Thomson." In this assignment it was stipulated that it was to be void in case Fowler failed to bid off the property. For some reason this assignment never took effect, and when the interest of R. L. Thomson was subsequently offered for sale at public outcry it was bid off by the defendant Spears, and on December 7th, 1874, the heirs of R. L. Thomson conveyed to him the interest of their intestate in the mill-tract, describing it as a one-fourth undivided interest. Subsequently, but at what particular time is not stated, J. S. R. Thomson, under the belief that he owned a one-half interest in the mill-tract, (one-fourth as devisee under the ninth clause of the will, and one-fourth as purchaser of the share of his brother, H. H. Thomson,) conveyed to Fowler and Spears each a one-twelfth interest, so that J. S. R. Thomson, Fowler and Spears now claim to be the exclusive owners of the mill-tract, the share of each being one-third. These parties claim to have expended large sums of money in repairs and improvements, made, as they allege, under the belief that they were the sole owners. As has been stated the plaintiffs, Mrs. Nowell and Mrs. Mills, were minors at the time of the partition in 1868, the former not having attained the age of twenty-one years until February 14th, 1870, and the latter on April 6th, 1872. J. S. R. Thomson was the guardian of Mrs. Nowell and had a full and satisfactory settlement of his guardianship accounts with her a few days after she attained her majority.

The plaintiffs contend that by reason of the alteration of the estate, by the sale for partition in 1852 and the purchase under it by the testator, the devise in the ninth clause of the will was

revoked, and that the entire tract passed under the tenth clause, and that they are therefore each entitled to an undivided one-seventh of the mill-tract, and by this action they demand partition of the same with an account for rents and profits. The defendants, denying *in toto* the claim of the plaintiffs, insist that, by a proper construction of the will the entire interest in the mill-tract passed to the sons of Henry H. Thomson, to the exclusion of the daughters; and as a further defence J. S. R. Thomson pleads the statute of limitations as a bar to the claim of the plaintiffs to the one-fourth interest bought by him from H. H. Thomson, but expressly waives the benefit of any such plea as to that portion now owned by him under the will, to wit, the one-sixth of the mill-tract. The defendants also insist that the plaintiffs are estopped by their conduct from claiming any interest in the land or the rents and profits thereof.

The Circuit judge held that the purchase by the testator at the sale for partition in 1852 did not operate as a revocation of the ninth clause of the will; that under that clause the "sons" took only one-eighth of the mill-tract, and that the remaining seven-eighths must be equally divided among all of the children of Henry H. Thomson; that J. S. R. Thomson's plea of the statute of limitations should be sustained, except as to the claim of Mrs. Nowell; that the plaintiffs can make no claim against the defendant Spears as to the one-fourth conveyed to him by the deed in which the plaintiffs joined; that the plaintiffs are entitled to an account of the rents and profits for a period beginning four years before the commencement of the action; that the defendants are not entitled to any compensation for the improvements, and that there is nothing in the testimony to estop the plaintiffs.

From this decree both parties have appealed upon various grounds, which raise the following questions: 1st. Did the purchase by the testator at the sale for partition in 1852 operate as a revocation of the ninth clause of the will? 2d. What interest did the "sons" take, under the will, in the mill-tract—the whole or only an undivided one-eighth? 3d. Is there anything in the case which will estop the plaintiffs from making any claim to the mill-tract? 4th. Should J. S. R. Thomson's plea of the statute of limitations be sustained as to all or any of the plaintiffs? 5th.

Are the defendants liable at all for rents and profits? If so, from what time? 6th. Are the defendants entitled to any compensation for improvements?

1. In considering the first question—that of revocation—we shall not attempt to follow the counsel in a detailed consideration of the numerous authorities cited, but will content ourselves with extracting from these authorities what we regard the fundamental principles established by them, and then apply these principles to the case in hand. The doctrine of implied revocation arising from an alteration of the estate of the testator, rests upon two principles. *First.* That where there has been such an alteration in the estate of the testator after the making of the will, as would naturally imply an intention to revoke the whole or any part of the will, such an intention will be respected and the alteration will effect a revocation either in whole or in part, as the case may be. If the testator, while being possessed of a certain estate in a particular piece of property, makes a disposition of it by will, and afterwards either parts with that estate or converts it into an estate of a different nature or quality, this, of itself, may imply an intention to revoke the devise; for the fact that he has indicated an intention to give an estate of a particular nature or quality to a particular object of bounty, does not warrant the belief that he intended an estate of a different nature for the same object of bounty. Therefore, where there has been a change made by the testator in the subject of the gift, and no change made in the will, either by codicil or simple republication, an intention to revoke may be implied by such alteration in the subject of the gift. But, *secondly*, the authorities cited show that even where the testator, after the making of his will, parts with the estate devised "and then takes it back by the same instrument, or by a declaration of uses, it is a revocation, because he once parted with the estate." Hence, not only where the alteration of the estate was such as to indicate an intention to revoke, but even where the alteration was such as would not imply any such intention, the rule applied, and a revocation would be implied from the simple fact of the alteration. This rested upon a second principle, that a devise was in the nature of a conveyance, and, therefore, an estate acquired after the making of the will could

z

not pass under it. So that if a person possessed of an estate in certain real property devised it to A, and subsequently conveyed it away, the devise would be revoked, even though he might, by the same instrument, have again acquired precisely the same kind of estate in the property which he had conveyed away ; and this was because the estate which the testator held at the time of his death, though of precisely the same nature and quality as that which he had at the time his will was made, was acquired subsequently, and, therefore, could not pass under the will. These two principles seem to have been well settled and fully recognized in England prior to the statute of 1 *Vict.*, c. 26, and would doubtless have been fully recognized in this state (*Cogdell* v. *Cogdell*, 3 *Desaus. Eq.* 346,) prior to our act of 1858. 12 *Stat.* 700. Since that act, however, subsequently-acquired real estate may pass under a will, provided there are words sufficient to cover it, and, therefore, it seems to us that there is now no room for the application of the second of the two principles upon which, as we have seen, the doctrine of implied revocation from an alteration of the estate rests. If this be so, then the only inquiry in this case is, whether the addition to the interest of the testator in the " Mill Tract," which he acquired at the sale for partition in 1852, affords any indication of an intention to revoke the devise contained in the ninth clause of the will. Under the view which we take of the second question in this case, as will presently be seen, the " sons " of Henry H. Thomson only took under the ninth clause one-eighth of the " Mill Tract," and there was therefore, practically, no alteration whatever in the estate or quantity of interest devised to the " sons " by that clause, and no evidence whatever of any intention to revoke. The estate and the quantity of interest devised to the sons by that clause remained precisely the same, at the death of the testator, that it was when the will was made, and it is impossible to discover any intention to revoke by the purchase of an additional interest in 1852. If it were possible for us to hold that, by a proper construction of the will, such additional interest would pass to the " sons " under the ninth clause, then it would be necessary to pursue this inquiry.

In addition to this view of the question, we find that the doc-

trine of implied revocation from alteration of the estate did not apply in cases of partition. · As is said in 1 *Jarm. on Wills* *134 : " The rule that a conveyance in fee of freehold lands, executed for a partial purpose, revokes a will made before 1838, admits of two exceptions. The first is in the case of a partition between tenants in common or coparceners, which, by whatever kind of assurance effected, does not, in equity at least, revoke a prior devise, provided the conveyance be confined to the object of the partition, merely assuring to the testator in the lands allotted to him in severalty an estate precisely correspondent to that which he previously had in his undivided share." It is true, as has been argued, that in England, where this exception has been established, down to a comparatively recent period there was no sale for partition, but there must have been an actual partition, yet we do not see why this should affect the principle upon which the exception rests, which seems to be that partition is a special case, that it is not the free and voluntary act of the party, but that he may be compelled to make partition. *Attorney-General* v. *Vigor*, 8 *Ves.* 281. Hence, where partition is the *sole* object the rule will not apply. *Rawlins* v. *Burgis*, 2 *Ves.* & *B.* 386 ; *Luther* v. *Kidby*, stated in note to 3 *P. Wms.* 170. For, as is said in a note to 1 *Jarm., supra :* " The act of partition therefore furnishes no evidence of an intention to revoke." But where partition is not the *sole* object, and in making it other purposes are accomplished, then an intention to revoke may be implied. Tickner *v.* Tickner, mentioned in *Parsons* v. *Freeman*, 3 *Atk.* 742, 750 ; *Brydges* v. *Chandos*, 2 *Ves.* 429. So that it seems to us, when the sole object is partition, no matter how it may be effected, whether by sale or otherwise, the rule does not apply, for the reason that no intention to revoke can be implied. And even if it could be said that the estate which the testator originally had in the one-eighth of the " Mill Tract " had been parted with and acquired again subsequent to the making of the will, by virtue of his purchase at the sale for partition, that, of itself, since the act of 1858, would furnish no ground for implying a revocation, in the absence of any indication of an intent to revoke.

We are not, however, prepared to assent to the proposition that the testator ever did part with his original interest in the

one-eighth of the "Mill Tract," or that he subsequently acquired the same interest by the purchase at the sale for partition. On the contrary, we think there is great force in the view thrown out by Dargan, Ch., in *Ex parte Geddes*, 4 *Rich. Eq.* 304, (though it is not the point decided in the case,) that where one of two tenants in common buys land at a sale for partition, the title of the purchaser to his own moiety would be referred to its original source, and would not be considered as derived from the sale for partition. This view is based upon the idea that at a sale for partition the master sells as the agent of the parties— that is, of the tenants in common—and if one of them buys, as he cannot become a purchaser from himself, either directly or through the medium of his agent, his title to his original share is not derived from the sale; that he held before the sale, and the sale could give him no more. There would be no change of title, so far as his share was concerned, and the result would be the same as if the other tenants in common had, without a sale, conveyed their interest to him. We therefore concur with the Circuit judge that there was no revocation of the ninth clause of the will.

2. The next question is, what interest did the "sons" take under the ninth clause of the will, in the "Mill Tract"— the whole or only one-eighth? The determination of this question involves a consideration of the proper construction of the will. We must first endeavor, if practicable, to ascertain the real intention of the testator, and, unless it is in conflict with some rule of law, give it full effect. To ascertain the intention we must resort, not to conjecture as to what was likely to be the wishes of the testator, but to the words in his will, and the circumstances by which he was surrounded at the time, and from these sources deduce his intent. We are to examine the will as a whole, and, from its terms, as applied to the surrounding circumstances, determine what was in the mind of the testator at the time he executed his will. For while it is true that in a certain sense a will speaks at the death of the testator, yet, as it was well put in the argument of one of the counsel, it speaks then what was in the mind of the testator when his will was signed. We cannot conceive how it can be otherwise. If it be

true, as it undoubtedly is, that we must resort to the words used by the testator to ascertain his intention, we cannot understand how certain words, used with a certain intent in 1845, can be said to have been used with a different intent, simply because the testator lived for twenty-three years after he had used them, during which time many changes in his property may have occurred, when he has not seen fit to make any change in the words used by him to express his intention. In this case it is very clear that the testator intended to dispose of his whole estate, not only that which he had at the time of making his will, but also that which he might thereafter acquire. Now, if the act of 1858 had never been passed it would have been impossible to carry this manifest intent of the testator into effect, at least so far as any after-acquired real estate was concerned, because such intent, being in conflict with a well-settled rule of law, could not be allowed to prevail, but since the passage of that act there is no difficulty in the way of carrying out such intention.

Another well-settled rule of construction is, " that all the parts of the will are to be construed in relation to each other, so as, if possible, to form one consistent whole," (2 *Jarm. on Wills* 741) ; and if there is an apparent conflict or inconsistency between the different parts, such a construction must be given, if practicable, as will reconcile such conflict and give effect to each part.

It is also well established that, while as a general rule parol evidence is not admissible in the construction of a will, yet, as said by Wardlaw, Ch., in *McCall* v. *McCall,* 4 *Rich. Eq.* 455 : " In ascertaining the subject of a testator's disposition, the court may inquire into the situation of his estate, and into every material fact which is auxiliary to the just interpretation of his words, for the purpose of identifying the thing intended by the words employed." And again, at page 456, " any evidence is admissible which merely tends to explain and apply what the testator has written, and no evidence can be admitted which merely shows what he intended to write."

We must also bear in mind the fact that the language of the act of 1858, (12 *Stat.* 700,) which was the law in force at the time this will took effect, differs somewhat from the language

used when this act was subsequently incorporated into the General Statutes, p. 440, and also from the English statute of wills. 1 *Vict., c.* 26. The language of the act of 1858 is : " Real estate purchased or otherwise acquired after the making and publishing of last wills and testaments shall pass by and under the same, *in the same manner and to the same extent as personal estate now does.*" So that to determine the proper construction of this act it is necessary to inquire what was the rule as to subsequently-acquired personal property. When the act of 1791, (5 *Stat.* 163,) which declared " that no lands or personal estate which shall be acquired by any person after the making of his or her will shall pass thereby unless the said will be republished," was repealed in so far as personal estate was concerned, by the act of 1808, (5 *Stat.* 573,) it left the rule, as to that class of property, the same as it was at common law. By that law the rule was, that subsequently-acquired personal property would pass under a will, provided there were any words in the will indicating an intention of the testator so to dispose of it. But where no such intention could be discovered from the words of the will, then subsequently-acquired personal property would not. pass thereby. As is said by Johnston, Ch., in *Garrett* v. *Garrett,* 2 *Strob. Eq.* 283, decided prior to 1858, " wills of personal property, like wills of real estate, are actually nothing more than the declaration of the testator's intention as it exists at their date, and as it arises from a contemplation of the state and condition of his property at that time. But there is a material difference between the two, in this, that wills of realty are essentially conveyances, (though revocable), and therefore can operate on no lands not then belonging to the testator ; whereas, wills of personalty are not only revocable but, as a general rule, ambulatory, and will operate upon after-acquired property answering to the terms of the instrument, provided it be in the testator's hands at his death. The general rule then is, that testaments take effect, or, as it is sometimes expressed, speak at the death of the testator, and are to be applied to his personal estate as it exists at that time. And this should be the construction in all doubtful cases. Where we can pronounce with confidence that the testator meant to announce an intention confined to the state of affairs existing at the

date of his will, either in reference to the specific subjects which he wished to pass under it, or the persons to enjoy them, or truly intended in any other way to abridge the ambulatory capacity of the instrument, the construction must be such as to conform to the special intention thus indicated or expressed."

Guided by these principles, let us consider whether the interest which the testator acquired in the mill-tract, subsequent to the execution of his will, passed under the ninth or the tenth clause of his will. What intention do the words used by him, read in the light of the surrounding circumstances, indicate? It appears, from the testimony, that at the time he made his will he only owned one-eighth of the mill-tract, and that he subsequently acquired the remaining seven-eighths. We think it absolutely certain that the testator intended to give, by the ninth clause, to the remaindermen, (the "sons," as the event has proved), precisely the same portion that he intended for the life-tenant. He gives to her "*my interest or legatee's part* of the Walker and Tuck bottoms, joining her lands, or *my part* of the mill-tract, * * * just as may suit my executor best." Now, the first inquiry which presents itself upon reading this language is, did the testator design to give the life-tenant a different proportion of the Walker and Tuck bottoms, in case the executor should prefer for her to take that, from that which he intended her to take in the mill-tract, if that should be the one selected by the executor as the subject of the gift, or was the change of phraseology from "my interest or legatee's part" to "my part," merely accidental, or such as persons are apt to make when referring a second time to the same thing for the purpose of avoiding sameness of expression? We confess that we are unable to discover anything in the will which would indicate an intention to give different proportions of the two tracts of land referred to in this clause to the objects of bounty there named, and the most natural inference is, that the testator, knowing that he only owned an undivided interest in these lands, and having, in the first instance, specified what that interest was—his "legatee's part"—he afterwards simply referred to such undivided interest as "my part," without again explaining what that part was. This view is in accordance with "the situation of his estate" at the time

which, as we are told by Wardlaw, Ch., in *McCall* v. *McCall, supra,* we may inquire into with a view of ascertaining "the just interpretation of his words, for the purpose of identifying the thing intended by the words employed." At the time the testator's "part" of the mill-tract was the part he was entitled to as devisee (inartistically called legatee) of his father, and as things then stood, "my interest or legatee's part" "and my part" were convertible terms meaning exactly the same thing, and we are not at liberty to attribute different meanings to them. The words of the ninth clause, therefore, do not indicate an intention to give more than the interest to which the testator was entitled as devisee of his father. They may therefore be read as if the testator had, by the ninth clause, given to M. C. Thomson for life, and after her death, to the executor and his sons, one undivided one-eighth of the mill-tract, as that was his part under the will of his father; and if so read, there can be no doubt that there was no intention disclosed to give more than that proportion to the objects of bounty therein named.

But, in addition to this, the testator in the same clause uses this language: "This being all I desire she shall ever have of my estate." Now, to give to the ninth clause the construction contended for by the defendants would be, in contravention of one of the settled rules of construction, to deprive the language just quoted of any force or effect whatever. At the time that the testator used these words it is very clear that he did not intend that the life-tenant should have any more of his estate than the proportion which he then specified, which, as we have seen, was only one-eighth of the mill-tract, and any construction which would give her more would be not only not in accordance with the intention of the testator, but absolutely subversive of it. Practically the testator declares that all she shall ever have of his estate, that is, all which, under *any* circumstances, she can have, is his "legatee's part," or one-eighth of the mill-tract, and to give her the remaining seven-eighths would be to make a new will for the testator.

But again, while it must be conceded that there are no words in the ninth clause referring, in express terms, to any estate which the testator might acquire after making his will, it is per-

fectly certain that there are such words in the tenth clause. In that clause the testator, in express terms, makes a different disposition of property that may be subsequently acquired, for there he gives to Henry Hopson Thomson and his "*children*"—not "*sons*"—not merely all the rest and residue of his estate, but "all the rest and residue of my estate of all kinds whatsoever, both personal and real, which I now have, *or which I may hereafter own, or which I may own at the time of my death.*" So that the question is, practically, narrowed down to this—shall the subsequently-acquired property pass under the ninth clause which, at most, can only cover it by implication or construction, or shall it pass under the tenth clause, which, in express terms, not only covers it, but gives it a different direction from that which it would take if we were to substitute our inferences as to the intention of the testator, for his intentions as expressly declared in his will ? To the question so stated there cannot be a doubt as to the answer.

But this is not all. So far as the testimony discloses, the only property acquired by the testator subsequent to the making of his will was the seven-eighths of the mill-tract, bought by him in 1852, and if the construction contended for by the defendants should be adopted, the result would be to entirely defeat that portion of the tenth clause by which the testator undertook to dispose of any property which he might acquire after making his will. But under the view which we take, that clause is given its full effect, and at the same time the objects of bounty named in the ninth clause are deprived of nothing which, in our opinion, the testator intended them to have.

The difference between this case and that of *Garrison* v. *Garrison*, 29 *N. J.* 153, the authority principally relied upon by the defendants, is, that here there is a clause in the will—the tenth—which, *in express terms*, disposed of all after-acquired property, while in Garrison v. Garrison there was no such clause There the residuary devisee claimed the subsequently-acquired property under a *general* residuary clause, which did not, in terms, refer to subsequently-acquired property, while here the plaintiffs claim under a clause which does, in express terms, not only refer to all subsequently-acquired property, but makes a

specific disposition of it, different from that which would be made of it if it could be brought under the ninth clause. Again, the New Jersey statute seems to be different from our act of 1858, and to follow the language of the English statute, by which subsequently-acquired property passes, "*unless a contrary intention shall appear by the will,*" while, under our act of 1858, such property can only pass where there are words in the will indicating an intention to that effect.

3. The next inquiry is as to the estoppel. In *Bigelow on Estoppel,* 434, it is said that: "It is now a well-established principle that where the true owner of property holds out another, or allows him to appear as the owner of, or as having full power of disposition over, the property, and innocent third parties are thus led into dealing with such apparent owner, they will be protected. Their rights in such cases do not depend upon the actual title or authority of the party with whom they have directly dealt, but they are derived from the act of the real owner, which precludes him from disputing, as against them, the existence of the title or power which he caused or allowed to appear to be vested in the party making the sale." In *Hand* v. *S. & C. R. R. Co.,* 12 *S. C.* 354, this doctrine, in reference to equitable estoppel, is laid down: "When one seeks to overthrow the state of things which he has actually brought about, to the prejudice of another, a clear wrong is perpetrated, and it is no excuse that he was ignorant of his title, for that ignorance should prejudice him alone as the result of his fault or misfortune; but its consequences should not be cast off from himself upon another, for each one should bear the consequences of his own fault or misfortune. But if silence only is alleged, knowledge of his right must be made to appear, for the possession of such knowledge is an essential element of the question of the wrongful character of such silence."

Applying these principles to the case in hand, we take it the inquiry is, did the plaintiffs, by any positive acts or declarations, induce the defendants, or any of them, to purchase the land in question or shares therein, under the supposition that the persons from whom they purchased had good right to sell what they purported to sell. The mere silence or non-action of the plain-

tiffs will not be sufficient, inasmuch as it not only does not appear that they were aware of their rights at the time of such purchases, but it does appear that they were ignorant of them, and there is not the slightest evidence warranting the belief that their silence or non-action was induced by an intention to deceive or mislead. As to the defendant Spears, we understood that it was conceded, in the argument here, that the plaintiffs were estopped, and it will not, therefore, be necessary for us to consider the question as to him.

Then as to the defendant Fowler. At the time he purchased from W. W. Thomson a one-fourth interest in the mill-tract it does not appear that the plaintiffs, or either of them, made any representations whatever to him in regard to the ownership of that property, for it was not until after that purchase that he took from them the assignment of their interest in R. L. Thomson's share, which in the assignment was stated to be an undivided one-fourth—the deed from W. W. Thomson having been made on September 22d, 1874, and the assignment on December 5th following. There can be, therefore, no pretence that the plaintiffs, by any positive act on their part, induced Fowler to become a purchaser of an interest in the mill-tract, by holding out to him the idea that they had no interest therein ; and their mere silence, at the time he became such purchaser will not, as we have seen, be sufficient to estop them, when it appears they were at the time ignorant of their rights and had no intention to deceive or mislead him, especially when, to say the least, it was doubtful whether they knew of the purchase until after it was made, and when they stood in no such fiduciary relation toward Fowler as made it their duty to speak. The case as to J. S. R. Thomson is even stronger, for his purchase of a one-fourth interest from H. H. Thomson was made as far back as December, 1868, and there is no shadow of pretence that he was induced to purchase by anything said or done by the plaintiffs.

The fact that the mill-tract was excepted from the partition made in 1868 can have no effect. No question as to the ownership of that tract was put in issue by the pleadings in that case, and, of course, no such question could have been there decided. Two of the plaintiffs were then under the disability of infancy and the

other under the disability of coverture, and their rights cannot be prejudiced by the failure to raise the question then. They can only be held bound by what was adjudged in that case, and nothing was there adjudged as to the ownership of the mill-tract.

So, too, we are unable to understand how the fact that the mill-tract was rented to Scaife as the property of the "sons" can affect the rights of the plaintiffs. Nothing that Scaife did could operate as an estoppel against Mrs. Scaife, and certainly not as to the other two plaintiffs.

Nor are we able to perceive how the fact that the plaintiffs stood by and saw the defendants making improvements on the property can operate as an estoppel. According to our view of the rights of the parties the plaintiffs and defendants were tenants in common of the mill-tract, and surely it cannot be contended that the mere fact that one of several tenants in common stands by and sees one or more of his co-tenants enter into possession of the common property and make improvements thereon, will estop him from asserting his right to partition.

So, too, we do not think there is anything in the case to warrant the position that there was a family arrangement by which it was understood that the brothers were to take the mill-tract to the exclusion of their sisters. There is, certainly, an utter lack of any direct evidence of anything like such an agreement, and the facts and circumstances relied upon for the purpose are not, in our judgment, sufficient to establish any such agreement. We concur, therefore, in the conclusion reached by the Circuit judge that there is nothing in the case to estop the plaintiffs, except as to any claim they may have had against the defendant Spears, as to whom the estoppel is admitted.

4. The next inquiry is as to the plea of the statute of limitations interposed by the defendant J. S. R. Thomson. We think it clear that the fiduciary relation existing between him and Mrs. Nowell prevented the running of the statute against her until such relationship was terminated, for, until that time, it was his duty to hold for her, and he could not, therefore, be regarded as holding adversely to her. The remaining inquiry on this branch of the case is whether this will protect the other two plaintiffs.

There can be no doubt but that the rule is well established in

this state that the minority of one of several tenants in common of land will protect the title of the others against the operation of the statute of limitations, (*Thomson* v. *Gaillard,* 3 *Rich.* 418 ; *Lahiffe* v. *Smart,* 1 *Bail.* 192,) and the question now presented is whether the principle upon which this rule rests requires that it should be extended to other cases than that of infancy. The principle upon which this rule is founded is stated by O'Neall, J., in *Thomson* v. *Gaillard, supra,* as follows : " The individual interests of co-heirs or distributees in land is co-extensive with the whole of it. * * * Each is entitled to the possession of the whole, and as against a trespasser * * * would be entitled to the writ of *habere facias possessionem* of the whole tract. * * * The right of entry cannot be confined to any part, but extends to all and every part. * * * As against an infant the bar of the statute could not be effectual until this disability was removed. * * * At any time during his minority, and until five years after full age, he has the legal right of entry on the land. If the right of entry of any one of the co-heirs remains, the legal title of the land is not defeated ; and it follows that if it may operate to evict a trespasser from the whole of the land no title can be acquired by possession. * * * The seizin of the co-heirs is in the whole tract and their title is one, and if the statute cannot defeat it as against all, it cannot against none." (*Sic.*) So the same judge in *Henry* v. *Means,* 2 *Hill* 333, 334, says : " Notwithstanding any one of several tenants in common or distributees might sue in trespass to try titles and recover his or her share of the land, that yet his or her recovery would entitle him or her to the writ of *habere facias possessionem* for, and an execution of it by delivery of, the possession of the whole land. When any one of the co-tenants obtains possession his possession is that of all, and hence, if any one was entitled to recover possession, all would be of necessity so entitled."

This being the principle upon which the rule is founded by which the minority of one of several co-tenants protects those of full age from the plea of the statute, it is difficult to conceive how we can escape the conclusion that, upon the same principle, the inability of J. S. R. Thomson to plead the statute against

Mrs. Nowell should not likewise enure to the benefit of her co-tenants—the other two plaintiffs. To make his plea of the statute available he must show an adverse possession for the requisite period to the whole of the land, and this he cannot do, because his possession could not be adverse to Mrs. Nowell as to any particular foot of the land. Before partition she was not entitled to any particular acre, but was seized of the whole, and there was therefore no particular acre of which J. S. R. Thomson could properly be said to have adverse possession, for to constitute such possession it must be open, notorious, distinct and hostile to all the world. So soon as it appears that the possession is subservient to, or by the permission of another, or that it is held under an acknowledgement of another's right, it at once loses its character of *adverse* possession. As is said in *Angell on Limitations*, § 434 : " As one co-tenant cannot be disseized of any particular part of the land unless all are disseized, so the relinquishment and yielding up to one of several tenants in common by the disseizor, after a disseizin for five years, of all the right, seizin, possession and betterments which the disseizor had in and to the proportion of that tenant in common in the premises, has the effect to put all the tenants in common in the seizin and possession of their shares respectively, and to prevent the operation of the statute of limitations against any of them prior to that time. Where there were several tenants in common of a tract of land, some of whom were infants, and the attorney in fact of the guardian of the infants made known their claim to the settler, who agreed to pay the taxes and keep possession for the infants without committing waste, it was held that this agreement enured for the benefit of the other tenants in common so as to prevent the statute from running against them." We think, therefore, that the protection afforded Mrs. Nowell from the plea of the statute of limitations must necessarily enure to the benefit of her co-tenants, the other two plaintiffs, not only in analogy to the well-settled rule in case of minority, but also in accordance with, and as a logical result of, the principle upon which such rule rests.

5. The next inquiry is as to the liability of the defendants for rents and profits. The defendants contend that inasmuch as the statute 4 and 5 Anne has been repealed by the General Statutes,

one tenant in common cannot now have any remedy against his co-tenants for rents of the common property received by him. That statute, however, simply declared " that from and after the said first day of Trinity Term, *actions of account* shall and may be brought and maintained    *    *    *    by one joint tenant and tenant in common    *    *    *    against the other as bailiff, for receiving more than comes to his just share or proportion," &c., (2 *Stat.* 438); and when it was repealed it simply destroyed the remedy given by it—an action of account—but it did not affect the remedy administered by the Court of Equity by virtue of its own inherent powers, which were not derived from that statute. For when the Court of Equity took jurisdiction for the purpose of partition it would proceed to decree complete relief by requiring an account for rents and profits from such of the co-tenants as may have had possession of more of the common property than their just share.    *Freem. on Co. Ten. & Part.*, § 425 ; 1 *Story's Eq. Jur.*, § 655, *et seq. ; Backler* v. *Farrow,* 2 *Hill's Ch.* 111. As said by Dunkin, Ch., in *Woodward* v. *Clarke,* 4 *Strob. Eq.* 170 : " The practice of the court in giving an account of rents and profits of real estate depends on general principles of equity."

Again : since the adoption of the code of procedure all the previously recognized forms of action have been abolished, and there is now but one form of action for the enforcement or protection of a right or the redress or prevention of a wrong, and hence the repeal of a statute giving a right to bring a particular form of action in a specified case, cannot prevent a party from seeking any relief he may show himself entitled to, either upon legal or equitable principles, by an action under the code.    We think, therefore, that the defendants may be required to account for rents and profits of so much of the common property as they may have used in excess of their shares.    *Valentine* v. *Johnson,* 1 *Hill's Ch.* 49 ; *Lyles* v. *Lyles,* 1 *Hill's Ch.* 86 ; *Jones* v. *Massey,* 14 *S. C.* 292.    But we agree with the Circuit judge that in taking this account reference must be had to the condition of the property before the improvements were put upon it by the defendants, as they are not to be held liable for such rents and profits as may be due to the improvements put upon the prop-

erty by them. *Thomson* v. *Bostick, McM. Eq.* 75 ; *Hancock* v. *Day, Id.* 69 ; *Holt & Kerr* v. *Robertson, Id.* 575. In taking this account the defendants must be allowed credit for the taxes paid by them and for such repairs as were necessary to preserve the property. This accounting, however, must be limited to the time of the commencement of this action. In *Rowland* v. *Best,* 2 *McC. Ch.* 317, the court said : " It is not an uncommon case for a party who lies by and permits another to occupy and enjoy property or funds of his own, under an apparent good title which he might and ought to have brought into discussion much earlier, to be restricted in his demand for an account of rents and profits or interest to the filing of the bill or four years before." This doctrine was fully recognized in *Riddlehoover* v. *Kinard,* 1 *Hill's Ch.* 381 ; *Woodward* v. *Clarke,* 4 *Strob. Eq.* 170; *Boyce* v. *Boyce,* 5 *Rich. Eq.* 268. Here it is manifest that all parties acted under an honest mistake, and we think it a very proper case for restricting the account to the commencement of the action.

6. The only remaining inquiry is, whether the defendants should be allowed anything for the improvements made by them. It is undoubtedly true, as said by Wardlaw, Ch., in *Corbett* v. *Laurens,* 5 *Rich. Eq.* 315, (citing the cases,) " that our cases have settled the question against the right of an improving tenant in common to the exclusive benefit of his improvements," and with this rule we are entirely satisfied, where the tenant who makes the improvements is aware, at the time, that other persons are entitled to interests in the property so improved. But where one has expended his money in the improvement of property, under the honest conviction of exclusive ownership in himself, it seems to us that there is manifest equity in allowing him the benefit of such improvements, as far as the same can be done without injury to the other co-tenants. As is said by Dargan, Ch., in a note to *Williman* v. *Holmes,* 4 *Rich. Eq.* 476 : " The high equity to be allowed compensation for permanent and valuable improvements should prevail wherever it can be done consistently with the rights of the other parties." Accordingly, in that case it was ordered that the partition should be so made as to give to the party who had made the improvements that portion of the common property

which he had improved, without accounting for the increased value imparted to such portion by the improvements, the improved part not being greater than his rightful share, and it being shown to the court that such partition could be made without injury to the other parties in interest. But even if such partition cannot be made, and a sale should become necessary, we see no reason why, upon the same principle, the improving tenant should not be allowed, out of the proceeds of the sale, not the cost of such improvements, but the amount which such improvements can be shown to have enhanced the value of the property. If two persons are tenants in common of a tract of land, worth, in its unimproved condition, $2000, and one of them, under an honest conviction of exclusive ownership, has made valuable improvements on the property, by reason of which its value is enhanced one hundred per cent., so that when the property is sold for partition it brings $4000, it seems strictly in accordance with the principles of equity and natural justice that the improving tenant should be allowed, out of the proceeds of the sale, the amount which his improvements have added to the value of the property, in addition to his one-half of the value of the property in its original condition ; and this would work no injustice to the other tenant who would still receive what alone he was, in justice and equity, entitled to have—the one-half of the value of the property in its unimproved condition. We think, therefore, that in this case the commissioners in partition should be directed to make the partition in such way, if practicable without injury to the rights of others, as to assign to the parties who have made improvements on the common property, the portions so improved, without estimating the additional value imparted to such portions by the improvements. And if this is impracticable and a sale should become necessary, then that the parties who have made the improvements shall, in addition to their shares, be allowed out of the proceeds of the sale such a proportion thereof, as such proceeds have been increased by the improvements.

The judgment of this court is that the judgment of the Circuit Court be modified so as to carry into effect the principles herein

2 A

announced, and that the case be remanded to the Circuit Court for such further proceedings as may be necessary.

SIMPSON, C. J., and McGOWAN, A. J., concurred.